**Mamie B. MORRIS, by her guardian ad litem, Rosa M. SIMPSON; Lucy R. Dellinger, by her guardian ad litem, Arah L. Rozzelle, and Pearl S. Cordell, by her guardian ad litem, Bill D. Cordell, Plaintiffs,**

v.

**Sarah MORROW, individually and in her official capacity as Secretary of the North Carolina Department of Human Resources, Barbara D. Matula, individually and in her official capacity as Director of the Division of Medical Assistance of the North Carolina Department of Human Resources, Defendants.**

No. C–C–84–216–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 20, 1984.

Charles E. Johnson, Moore, Van Allen, Allen & Thigpen, Charlotte, N.C., and Pamela C. Silberman, North Carolina Legal Services Resource Center, Inc., Raleigh, N.C., for plaintiffs.

Steven Shaber, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., for defendants.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

This case comes before the court on the parties' cross-motions for summary judg-

ment. Suit was filed on April 25, 1984, by plaintiff Mamie B. Morris under 42 U.S.C. § 1983 alleging that defendants Sarah Morrow and Barbara Matula had acted under color of state law in attempting to deprive her of her right to receive Medical Assistance (Medicaid) benefits pursuant to § 209(b) of Pub.L. No. 92–603, codified at 42 U.S.C. § 1396a(f). The court issued a temporary restraining order against defendants on April 30, 1984, to prevent them from changing the benefits paid to plaintiff Morris. On June 21, 1984, the court issued a preliminary injunction against defendants to prevent them from terminating plaintiff Morris' Medicaid benefits pending the final outcome of this case, 594 F.Supp. 112 (1984). On July 31, 1984, the court certified a class action in this case and extended the preliminary injunction to class members and named plaintiffs Lucy R. Dellinger and Pearl S. Cordell.

Both plaintiffs and defendants have moved for summary judgment. As there are no material facts in dispute, this case is ripe for determination at this time.

### I.

No material fact in this case is in dispute. The parties disagree about legal conclusions, but not about the relevant facts.

Defendant Sarah Morrow is Secretary of the North Carolina Department of Human Resources and is charged with the overall responsibility of administering the statewide Medicaid program.

Defendant Barbara D. Matula is the director of the Division of Medical Assistance of the North Carolina Department of Human Resources and has immediate supervisory responsibility for the Medicaid program, including the duty to insure that the program complies with federal law.

Both defendants are sued individually and in their official capacities. At all times material to this action, they have acted under color of law, custom and usage of the State of North Carolina.

Plaintiff Mamie B. Morris is a 93-year-old widow who currently resides at Providence Convalescent Residence, a skilled care nursing home in Charlotte, North Carolina. Plaintiff Morris entered the nursing home in January 1983 after suffering several heart attacks. She is confined to a bed or wheelchair and is in need of twenty-four-hour skilled nursing care. Her monthly charge for care at the nursing home is about $1,600.00. Her income is $409.00 per month from Social Security Disability Insurance Benefits, Supplemental Security Income (SSI), and rent that she receives for her house at 651 Louise Avenue, Charlotte, North Carolina. Her daughter and son-in-law pay her $75.00 per month in rent for the house. The total assessed value of the house and lot is $37,190.00. Both plaintiff Morris' daughter and son-in-law are disabled, unemployed, and dependent upon Social Security benefits.

Plaintiff Morris depends on Medicaid benefits in order to pay her medical expenses. Only by evicting her daughter and her daughter's husband, and then selling the house, could plaintiff pay for more than a few days' stay at the nursing home.

In October, 1983, plaintiff Morris received a letter from the Mecklenburg County Department of Social Services, the administrator of the Medicaid program in that county, which stated that unless she made a good faith effort to sell her house by April 30, 1984, her Medicaid benefits would be terminated. Plaintiff has not made an attempt to sell the house.

Plaintiff Lucy R. Dellinger is an 82-year-old widow who has resided at Randolph Manor Nursing Home in Charlotte, North Carolina, since November 1982. She owns a house at Route 6, Box 812 J–7 in Mecklenburg County, North Carolina. The house and lot have an assessed value of $36,340.00. Ms. Dellinger suffered a stroke in 1982. Her right side is now paralyzed, and she is incontinent and needs help in many daily activities. She is in need of twenty-four-hour nursing care. Her monthly income is $435.00 from Social Security and rent of her house. Her medical bills at the nursing home are about $1,600.00 per month. Medicaid pays the

majority of this bill. Ms. Dellinger could not afford to remain in the nursing home without Medicaid benefits.

In January, 1984, Ms. Dellinger received a letter from the Mecklenburg County Department of Social Services that stated that unless she made a good faith effort to sell her house by July 31, 1984, her Medicaid benefits would be terminated. Ms. Dellinger's house is currently occupied by her son who pays as rent the taxes, the insurance, and the maintenance on the house, plus $50.00 per month.

Plaintiff Pearl S. Cordell is an 89-year-old widow who has been at the United Church Retirement Home in Newton, North Carolina, since November 1981. She owned a house at that time assessed at $20,600.00 as well as surrounding property assessed at $37,600.00. She was admitted to the nursing home after one of her legs was amputated. After admission, her other leg was amputated. She currently does not recognize anyone and cannot care for her personal needs. She requires twenty-four-hour nursing care.

Ms. Cordell's income is now $549.00 per month from Social Security and rent for the residential and nonresidential property. Her medical bills at the nursing home are more than $1,600.00 per month, most of which is paid by Medicaid.

In October, 1983, Ms. Cordell received a letter from the Catawba County Department of Social Services which stated that unless she made a good faith effort to sell her house and property by April 1, 1984, her Medicaid benefits would be terminated. Later it was determined that the house and $12,000.00 worth of surrounding property were exempt from this requirement because they were occupied by her dependent adult child. This son pays Ms. Cordell $60.00 a month in rent; other family members pay her $75.00 a month for use of the house and property.

Efforts were made to sell all but the house and one acre of property. As a result Ms. Cordell's benefits were extended until the end of June, 1984. However, she received an additional notice on June 8, 1984, informing her that her benefits would be terminated after June 30, 1984, because of her ownership of the non-exempt property.

The class members in this suit are all persons in situations legally similar to those of plaintiffs, *i.e.* those persons otherwise eligible for Medicaid benefits as medically needy recipients to whom benefits have been denied or threatened to be terminated because of ownership of property in excess of the reserve amount defined by defendants' "$6000/6% rule," as explained below.

Defendants have established guidelines for the determination of eligibility of medically needy applicants for Medicaid benefits. These guidelines exist in state regulations, the Medicaid Manual, and instructions and memoranda. According to N.C. Medicaid Manual § 3300, a single applicant is not eligible for Medicaid if he or she owns more than $1,000.00 worth of "reserve," which is generally liquid assets and real property other than a homesite or income-producing property.

From January 1, 1972, to September 1, 1983, real property that was not a homesite was "excluded from consideration in determining eligibility" if it produced income. N.C. Welfare Programs Manual § 2326 (1971). The established practice was to treat property as income-producing "if it generated any annual income over and above its expenses, such as taxes, maintenance, and mortgage payments." Affidavit of Alene Matthews, § 11. As a result of instructions received from the United States Department of Health and Human Services (HHS), defendant Matula altered this test on August 26, 1983, in a document labeled DMA Administrative Letter No. 02–84. Under the new regulations, property would be exempt from the reserve amount only if there was equity of less than $6,000.00 and the property produced at least 6% of the equity in annual income. This "$6,000/6% rule" changed the requirement that property only be "income-producing" in order to be exempt from reserve.

The property owned by the named plaintiffs is all income-producing under the test as it existed on January 1, 1972, because the income received exceeded the annual expenses. However, this same property is not exempt from reserve under the "$6,000/6% rule" that defendants now seek to apply. It is on this basis that defendants intend to terminate Medicaid benefits to plaintiffs and the class.

Effective January 1, 1974, certain states, including North Carolina, were given the option by Congress of determining eligibility requirements for Medicaid for aged, blind, and disabled persons either by the federally promulgated SSI standards or by using the state's own eligibility standards in effect on January 1, 1972. Section 209(b) of Pub.L. No. 92–603, codified at 42 U.S.C. § 1396a(f). North Carolina chose to continue using its January 1, 1972, standards rather than adopt the SSI standards. Thus, North Carolina became a so-called "209(b)" state.

## II.

The principal legal point of contention is whether North Carolina's decision to become a "209(b)" state has barred it from implementing a more restrictive test for exempt property than it used on January 1, 1972. Plaintiffs contend that until Section 209(b) has been specifically altered by statute, defendants are bound by the eligibility requirements in effect on January 1, 1972. Thus, the only permissible standard for income-producing property is the test used at that time or a less restrictive one. This would bar defendants from implementing the "$6,000/6% rule."

The relevant portion of Section 209(b) of Pub.L. No. 92–603, at 42 U.S.C. § 1396a(f) provides:

Notwithstanding any other provision of this subchapter (Subchapter XIX— Grants to States for Medical Assistance Programs) ... no State ... shall be required to provide medical assistance to any aged, blind, or disabled individual (within the meaning of subchapter XVI of this chapter) for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month ...

Defendants argue that Section 209(b) does not prevent them from using the "$6,000/6% rule." Furthermore, they argue that they were required to enforce this more restrictive test because of instructions from administrators of HHS and because of provisions relating to Medicaid contained in the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA):

[T]he single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility, which shall be the same methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a state in which such program is in effect. . . .

42 U.S.C. § 1396a(a)(10)(C)(i)(III). Defendants argue that this provision requires North Carolina to use the "$6,000/6% rule" because it is a methodology employed under the SSI program.

The court has previously addressed most of the legal issues now before it in the orders of June 21, 1984, and July 31, 1984, enjoining defendants from use of the "$6,000/6% rule." The court now adopts in full the legal conclusions contained in those orders. In this memorandum, the court will only summarize those past legal conclusions and then will address the matters that were not dealt with in the past orders.

■ The court has previously rejected the defendants' argument that Section 209(b) does not require North Carolina to apply eligibility rules no more restrictive than its January 1, 1972, eligibility rules for medically needy aged, blind or disabled Medicaid recipients. The court's interpretation of Section 209(b) is that while it

allows a "209(b)" state to use eligibility requirements stricter than those under the SSI program, it requires those states electing the Section 209(b) option to apply eligibility rules for these recipients that are no more restrictive than its January 1, 1972, rules. *See e.g., Winter v. Miller*, 676 F.2d 276 (7th Cir.1982).

The court has also rejected defendants' interpretation of the TEFRA provision. Defendants assert that the passage of TEFRA repealed or limited Section 209(b) by implication and that since the "$6,000/6% rule" is a methodology and not a standard, TEFRA required that the methodology used by the SSI program, including the "$6,000/6% rule," be used in all state Medicaid programs, including those of "209(b)" states.

■ The court rejected this interpretation of TEFRA because the provision in question contained no language expressly repealing Section 209(b), while Section 209(b) prohibits repeal by implication with its beginning statement: "Notwithstanding any other provision of this subchapter...." The court also found that the "$6,000/6% rule" was a standard and not a methodology. Thus, TEFRA does not require the defendants to adopt that standard.

■ Defendants further argue that HHS instructed them to adopt the "$6,000/6% rule" and that HHS's interpretation of TEFRA is entitled to great deference. The court previously rejected this claim because HHS's position is clearly inconsistent with the plain meaning of Section 209(b). As such, HHS's interpretations and instructions are not entitled to any deference and provide no basis for defendants' change in the Medicaid eligibility standards regarding income-producing property.

Defendants have made several new arguments not addressed before by the court. However, none of them justify any change in the court's previous conclusions of law in this matter.

First, defendants have pointed to regulations, which they claim support their interpretation of Section 209(b). According to defendants, 42 C.F.R. § 435.121 allows a state to use SSI criteria or more restrictive criteria in determining resource levels. Thus, under the regulations, North Carolina can adopt the "$6,000/6% rule" that is part of the SSI standards. Defendants claim that the regulations show that the federal government has interpreted Section 209(b) consistent with defendants' interpretation.

■ This regulation might be helpful in interpreting legislation. However, it is inapplicable here. The regulation cited by defendants, 42 C.F.R. § 435.121, applies only to categorically needy Medicaid recipients, not to medically needy recipients such as plaintiffs. The applicable regulation is 42 C.F.R. § 435.841, which provides that resource standards for medically needy recipients established by states be "at least equal to the higher of" resource standards used under the Aid to Families with Dependent Children (AFDC) or SSI plans. This regulation, which applies to the standard in question, allows the state to adopt less restrictive standards than those used under SSI.

Congressional action during the summer has supported the court's reasoning in its June 24, 1984, order. In the Deficit Reduction Act of 1984, Congress directed that there would be an 18-month moratorium against any penalty or regulatory action by HHS against a state because the state used less restrictive resource standards or methodologies than under SSI. Section 2373(c) of Pub.L. No. 98–369, 98 Stat. 494, 130 Cong.Rec. 6545 (June 22, 1984). The House-Senate Conference Report clearly shows that Congress through TEFRA did not intend to change "the policies governing income and resource standards and methodologies for determining eligibility of the medically needy" that were previously in effect. H.R.Rep. No. 98–861, 130 Cong. Rec. 6741. The report stated that "states may use less restrictive standards and methodologies in their noncash programs [such as for medically needy Medicaid recipients], although they are still foreclosed from being more restrictive than the rele-

vant cash assistance programs [such as SSI or ADFC]." H.R.Rep. No. 98–861, 130 Cong.Rec. 6742.

The report criticized the Secretary of HHS for her interpretation of TEFRA, which ignored the intent of its provisions concerning Medicaid. One example cited was the Secretary's treatment of "certain income and resource rules as 'methodology' that must strictly follow AFDC or SSI rules, even though all States with medically needy programs have traditionally been permitted to use less restrictive rules" than those used in SSI. H.R.Rep. No. 98–861, 130 Cong.Rec. 6741. This supports the court's decision that the "$6,000/6% rule" is a standard, not a methodology.

The court previously has ruled that TE-FRA did not affect North Carolina's obligation under Section 209(b) to use eligibility requirements no more restrictive than those in effect on January 1, 1972. The congressional intent as clarified this summer shows that this is the correct interpretation. The Secretary's instructions to defendants are not supported either by the language of TEFRA, nor by the Congressional intent.

Defendants now argue that the test used in determining income-producing property in 1972 was not that stated as the generation of "any annual income over and above its [the house's] expenses, such as taxes, maintenance, and mortgage payments." Affidavit of Arlene Matthews, ¶ 11. Instead the test was simply that of whether the property is producing a "reasonable income." N.C. Medicaid Manual § 2327 (1971). Defendants argue that while the test identified by Ms. Matthews of income over costs was reasonable in 1972, it is not reasonable in the 1980's. Thus, defendants claim that the 1972 standard is still in effect under any requirement that property produce "reasonable income," such as a newly proposed requirement by North Carolina that property produce 6% in annual income before being exempt from resource calculations. Second Affidavit of Alene Matthews.

Such an interpretation of the 1972 standards would allow defendants to escape their clear obligation under Section 209(b). The record shows that in 1972 the test used by North Carolina for exempting real property not used as a homesite was whether it produced income over costs. Affidavit of Alene Matthews § 11, N.C. Medicaid Manual § 2326 (1971) exempts "real property producing income (income included in budget)." The "reasonable income" language is just a description of this same standard. Section 209(b) requires the defendants to use the same eligibility requirements now as in 1972. It does not allow new standards on the basis of a change in what defendants feel is "reasonable."

Finally, defendants argue that the proposed 6% income test should satisfy all demands of plaintiffs, especially in view of the increasing financial demands on the Medicaid program. Second Affidavit of Alene Matthews. While the defendants' concerns about the financing of Medicaid are real, the expected difficulties do not justify defendants' ignoring the state's obligations under Section 209(b).

■ The proposed 6% income test may be more or less restrictive than the 1972 standards, depending on the total costs of upkeep of the house. However, if real property produces total income, but annual income less than 6%, the proposed test would not exempt the property from resource calculations, while it would be exempt under the 1972 standards. To this extent, the proposed rule violates Section 209(b), and can not be adopted consistently with the requirements of Section 209(b).

### III.

■ In conclusion, defendants have violated Section 209(b) through their application of the "$6,000/6% rule." The preliminary injunction restraining defendants from terminating or denying Medicaid benefits on the basis of the "$6,000/6% rule" will now be made permanent. Defendants

are still under an obligation to pay all benefits to named plaintiffs and class members that were denied on the basis of the "$6,000/6% rule" after June 21, 1984. As the court ruled on July 31, 1984, this order does not require the payment of retroactive benefits in violation of the Eleventh Amendment because the required payments do not begin until after the court's preliminary injunction on June 21, 1984, at which time defendants were in clear notice that failure to follow the standards as set by the court would be a violation of the law for which they would be answerable to the court.

The court also enjoins defendants and their successors in office from adopting or employing an eligibility standard for medically needy Medicaid applicants and recipients who own income-producing property that is more restrictive than the eligibility standard in effect on January 1, 1972. Defendants' proposed 6% income test, which in cases will be more restrictive than the January 1, 1972, test, shows the need for this injunction.

█ The court will also require that defendants notify each class member in writing of his or her right to receive Medicaid benefits after June 21, 1984, if they were denied because of the "$6,000/6% rule." The notice will inform class members that there may be administrative or judicial remedies available for the recovery of Medicaid benefits prior to June 21, 1984, provided that all other eligibility standards are met. Such notice does not require payments in violation of the Eleventh Amendment. *Quern v. Jordan,* 440 U.S. 332, 346–49, 99 S.Ct. 1139, 1147–49, 59 L.Ed.2d 358 (1979).

## FINAL JUDGMENT

For the reasons stated in the accompanying memorandum of decision, filed this day,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

1. Defendants must adopt and employ a standard for determining the eligibility of medically needy applicants for and recipients of Medicaid who own income-producing property that is no more restrictive than the eligibility standard in effect on January 1, 1972, that real property not used as a homesite is excluded from consideration in determining eligibility if it generated any annual income over and above its expenses. The standard enforced by defendants in the "$6,000/6% rule" violates 42 U.S.C. § 1396a(f) by implementing more restrictive standards than those in effect on January 1, 1972.

2. Defendants, their successors in office, agents, employees, and all persons acting with them are permanently enjoined from denying or terminating Medicaid benefits for the medically needy pursuant to the "$6,000/6% rule" when all other eligibility factors are met. Defendants are to provide immediately Medicaid to all class members who have been denied benefits on the basis of the "$6,000/6% rule."

3. Defendants are permanently enjoined from adopting or enforcing an eligibility standard for medically needy Medicaid applicants and recipients who own income-producing property that is more restrictive than the eligibility standard in effect on January 1, 1972.

4. Defendants shall send notice to all class members informing them of their right to receive Medicaid benefits wrongfully denied after June 21, 1984, as ordered by the court on July 31, 1984, and informing them of possible administrative and judicial remedies for benefits denied before June 21, 1984. Plaintiffs have already submitted a draft notice. Defendants shall file a draft notice or comments on plaintiffs' proposed notice within ten (10) days of the filing of this judgment.

5. Defendants shall provide plaintiffs' counsel with sufficient information to allow them to monitor the implementation of this order.

6. As prevailing parties, plaintiffs shall recover from defendants attorney fees in accordance with 42 U.S.C. § 1988. Plaintiffs shall submit a petition for fees within thirty (30) days of the filing of this judgment.

7. The court shall retain jurisdiction over this case. The parties shall report to the court on the implementation of this judgment at least every third month, beginning in March, 1985. If there is any legislative action that might affect the permanent injunctions in this judgment, the parties should so inform the court immediately.